The People of the State of Illinois ex rel. Michael Sokoll and George Egan, Appellants, v. The Municipal Court of Chicago and Thomas A. Green, Judge Thereof, Appellees.

**Gen. No. 36,956.**

Opinion filed July 2, 1934. Rehearing denied July 17, 1934.

SAMUEL A. & LEONARD B. ETTELSON, MILTON D. SMITH and WILLIAM W. SMITH, for appellants; SAMUEL A. ETTELSON, CARL J. APPELL and EDWARD C. HIGGINS, of counsel.

HIRAM T. GILBERT, for appellees.

Mr. Presiding Justice O'Connor delivered the opinion of the court.

July 19, 1933, the People of the State of Illinois, on relation of Michael Sokoll and George Egan, filed their petition in the superior court of Cook county against the municipal court of Chicago and Thomas A. Green, a judge thereof, praying that a rule be entered requiring the respondents to answer the petition within a date to be fixed by the court, to show cause, if any, why a writ of prohibition should not issue commanding the municipal court of Chicago and Judge Green to desist and refrain from attempting to exercise any further jurisdiction over an alleged contempt proceeding then pending before Judge Green. On motion of the respondents the court held the petition to be insufficient in law and dismissed it. The petitioners appeal.

The petition alleges in substance that on May 22, 1933, an information, by leave of court, was filed in the municipal court of Chicago against Iver Swedberg, charging that on January 29, 1933, he negligently drove a motor vehicle on a highway in the City of Chicago, and as a result thereof injured a person and damaged his property, and that he left the place of the injury without giving his name, etc., to any police officer, in violation of sec. 41a of the Motor Vehicle Act (Cahill's 1933 Statutes, page 1896).

On May 29, Swedberg was arraigned before Judge Green; he pleaded not guilty, waived a jury and there was a trial. He was found guilty as charged and sentenced to the House of Correction for a term of 90 days and fined $25. A mittimus was issued on the same day, and Swedberg was taken and confined to the House of Correction. Afterward, on June 16, Judge Green, sitting in the municipal court, entered an order in the same case which recites that the cause came on to be heard on petition of Swedberg "in support of a motion for a writ of *coram nobis* or *qua coram*

*vobis* resident,'' and it was ordered that Swedberg be brought from the House of Correction before the branch of the municipal court over which Judge Green was presiding on the 17th of June, ''to appear at a hearing on a petition for new trial under section 89 of the Practice Act.'' Swedberg, in his petition, swears that he was arrested May 29, 1933, charged with violation of the Motor Vehicle Act, and that on a hearing before Judge Green he was without counsel and without means to employ one; that he had no opportunity to communicate with anyone for advice; that he was rushed to trial and summarily tried; that ''if he had had the benefit of counsel, his rights would have been protected and preserved, and the facts would have been brought out more clearly and forcibly''; that he was entitled to counsel under the Constitutions of the United States and of the State of Illinois.

On June 17th the court entered an order postponing the matter until June 1st, and on June 20th an order was entered by Judge Green appointing Joseph Roach *amicus curiae*. June 23rd Roach as *amicus curiae* filed a petition or information against the petitioners, Michael Sokoll and George Egan, and also against Morris Markin, Paul L'Amoreaux and William McEvoy, praying that they show cause by June 30th why they should not be punished for contempt of court for conspiring to cause Swedberg to give false testimony on the trial against him for the violation of section 41a of the Motor Vehicle Act, in that Swedberg there testified he was the owner of the motor vehicle involved in the information filed against him, when, as a matter of fact, the motor vehicle belonged to the Checker Taxi Cab Company. An order was entered in accordance with the prayer of the petition and the hearing was subsequently postponed to July 21st.

In the information filed by Roach, which was verified by him, he charges the persons named ''with the offense of wilful and malicious obstruction of justice

at the time it was being administered in this court."
It then charges that Morris Markin and Paul L'Amoreaux reside in New York and that they and other
persons "to the informant unknown, combined, conspired, confederated and agreed" to secure possession
of a great number of companies engaged in transporting persons for hire over the streets of various cities
in the United States and particularly in the City of
Chicago, with the purpose and intent "of unlawfully
and criminally fixing the sale price and limiting the
supply of automobiles to be manufactured and constituting a part of interstate commerce," which automobiles were to be used for transporting persons
throughout the United States; that it was the additional purpose of Markin, L'Amoreaux and other persons by systematic efforts to secure possession and
control of said transportation companies and that it
was the further purpose "of said conspirators as a
part of said conspiracy to: (1) Form a combination
to control the sale and delivery of taxicabs in the various cities of the United States; (2) To enhance the
price of cars built by the Checker Cab Manufacturing
Company" to cab drivers; (3) To secure a monopoly
in interstate trade of automobiles manufactured by
the Checker Cab Company; (4) "To form a combination between a manufacturer of a commodity moving
in interstate commerce and local users thereof, so as
to restrict the use thereof to said conspirators; (5) To
restrain and monopolize the commerce among the several states in regard to the sale of said automobiles;
(6) To destroy the right of dealers in said automobiles
to purchase them from other persons"; (7) To deprive a large number of cab drivers of an equal opportunity of purchasing such automobiles through interstate commerce and prevent such drivers from using
them upon the same terms "as drivers employed by
said conspirators and their various agencies"; (8) To

deprive the general public of Chicago and other cities of the advantage which would come from the "channels of interstate commerce being free and competitive in regard to said automobiles; (9) To arbitrarily and unreasonably, through the subserviency of municipal bodies of the cities of the United States and the legislatures of the States . . . control and fix the rates and fares of taxicabs," in Chicago and other cities and the price to be paid for such automobiles; (10) To limit and fix the price of such automobiles in advance; (11) To obstruct interstate commerce in such automobiles by limiting their purchase to the "companies controlled by said conspirators"; (12) To prevent vendees of automobiles transported in interstate commerce from reselling them in the State to which they were transported; (13) "To violate the Clayton Act . . . by unlawful agreements relative to the sale of such automobiles"; (14) To violate the Sherman Law and the Clayton Act by subjecting dealers in such automobiles to deprivation of their rights under the Constitution and laws of the United States, under color of certain ordinances passed by the city council of Chicago at the special instance and request of said conspirators; (15) To subject drivers of automobiles other than those manufactured by the Checker Cab Manufacturing Corporation to a deprivation of their rights under the Constitution of the United States and particularly under the Sherman Law and Clayton Act; (16) To deprive, under color of ordinances and statutes, the public in Chicago and other cities of the right, "privilege and immunity secured by the Constitution and laws of the United States," contrary to the Sherman Law and the Clayton Act; (17) To deprive taxi drivers not members of organizations controlled by "said conspirators" of their liberty and property by preventing them from pursuing their employment in Chicago and other cities; (18) "To admin-

ister the laws of the United States, and cause them to be administered, in a manner different from the true intent and purpose thereof, by transferring the property" of the Checker Taxi Company, an Illinois corporation, to a corporation of another state; (19) To violate the laws of Illinois against illegal combinations in restraint of trade; (20) "To commit the crime of perjury in the courts of Chicago . . . and of the United States, by aiding, abetting and otherwise procuring taxi drivers to commit perjury"; (21) To secure possession and control of the Checker Cab Manufacturing Company, of which Markin was president; (22) That the conspirators caused the Manufacturing Company to enter into such conspiracy to control the taxicab business; (23) That subsequently "said conspirators" secured possession and control of a large number of other taxicab companies in various cities of the United States; (24) That prior to entering into such contracts with the Checker Cab Manufacturing Company, other companies purchased their cabs from other manufacturing companies, but as a result of such illegal contracts such other companies were required to purchase their cabs from the Checker Manufacturing Company; (25) That in order to effect and maintain "said monopoly thus conspired . . . the said conspirators, pursuant to said conspiracy, had unduly influenced and caused legislative bodies, including the state legislatures and city councils of the several states of the United States to pass legislation preventing absolutely or almost completely restricting the opportunities of persons using any of the said automobiles other than that manufactured by the Checker Cab Company . . . that said legislation has been secured by cajolery, manipulation and in some instances by bribery; that said conspirators are now actively engaged in endeavoring to secure from said city council (of the City of Chicago) a franchise

which would restrict the taxicab business in Chicago to the Checker Taxi Company and the Yellow Cab Company''; (26) That there are many other companies manufacturing taxicabs; (27) That there are in Chicago a large number of taxicabs shipped in interstate commerce which as a result of said conspiracy cannot be used in interstate commerce; (28) That the Checker Cab Manufacturing Company conducts a large growing business at Kalamazoo, Michigan, from which it ships automobiles in interstate commerce; (29) That as a result of the conspiracy many persons who have purchased their own taxicabs will be unable to continue in business and will therefore be deprived of their means of livelihood, ''in violation of the Sherman Act and Clayton Act, and the Fourteenth Amendment to the United States Constitution''; (30) That the transportation of persons by taxicabs in Chicago is of vital concern to the people of the city and that the elimination of competition is a violation of the Sherman and Clayton Acts and of the laws of Illinois; (31) That the conspirators have caused an insurance company to be organized for the purpose of bonding taxicabs, ''and caused certain police officers connected with the traffic department to become interested in said insurance company''; that as a result of this, the police officers favor taxicabs operated by the companies controlled by the conspirators; (32) That the purpose of the conspirators is to endeavor to have legislation enacted fixing the bonds of taxicabs so high that only drivers of the Checker and Yellow cabs will be able to secure such bonds; (33) That ''the said conspiracy is a continuing one and is now and has been in full force, effect and operation''; (34) That pursuant to the conspiracy, Markin, L'Amoreaux, Sokoll, Egan and McEvoy, aided, abetted, encouraged and procured Swedberg in the proceeding before Judge Green in the municipal court ''to obstruct the justice being admin-

istered in said court," in that Swedberg, on May 29, 1933, appeared before Judge Green in that court charged "with the crime of leaving the scene of an accident, in violation of the laws of the State of Illinois," and was duly sworn as a witness in his own behalf on the hearing of the information filed against him, and he there testified that he "was the owner of a Checker taxicab" with which he had run down two persons, seriously injuring them; but that the cab did not belong to him but was the property of the Checker Taxicab Company; that such false testimony was procured by Markin, L'Amoreaux, Sokoll, Egan and McEvoy for the purpose of exempting the Checker Taxicab Company from civil and criminal liability, and that each of the persons just named knew that the cab did not belong to Swedberg but to the Checker Taxicab Company; that such false testimony tended to obstruct justice then being administered by Judge Green as a judge of the municipal court; and the prayer was that each of the parties named be brought before the court and dealt with as for a contempt of that court, or that a rule be entered commanding them to show cause why they should not be punished for contempt of court.

As stated, the hearing of this information was set by the court for July 21st, and two days prior to that time, July 19th, the petition in the instant case was filed. The petition alleges the matters hereinbefore set forth, much of which we have quoted from the petition or information filed by Roach, which is attached as an exhibit to the petition filed in this case. It is further alleged in the petition that the municipal court of Chicago was organized under an act passed by the general assembly of this State in 1905, commonly known as the Municipal Court Act; that the municipal court has jurisdiction only in the City of Chicago; that it is inferior to the circuit and superior

courts of Cook county, which are constitutional courts and have jurisdiction throughout Cook county; that the municipal court has no jurisdiction in equity cases, criminal cases above the degree of misdemeanor, tort cases where the damages exceed $1,000, and matters relating to mandamus and other extraordinary writs, while the superior and circuit courts of Cook county are courts of unlimited jurisdiction; that at the time in question Judge Green was presiding over a branch of the municipal court of Chicago known as the "Traffic Court."

The petitioners further allege that Judge Green had no jurisdiction to hear the petition or motion of Swedberg, under section 89 of the Practice Act, because Swedberg had already begun to serve the sentence imposed upon him by being incarcerated in the House of Correction. Petitioners averred that neither they nor the other persons named in the information filed by Roach advised or procured Swedberg to testify before Judge Green that he was the owner of the taxicab in question, and aver that the ownership of the cab at that time was wholly immaterial because the statute under which Swedberg was prosecuted (sec. 41a, ch. 95a) provided that the "person operating" the car at the time a person is injured by the cab and who drove away without leaving his name, etc., with the police officer, etc., was the one amenable to the law, and not the owner of the vehicle.

It is further alleged in the petition that Judge Green as judge of the municipal court had "announced and publicly stated to the public newspapers" that he would, in the Swedberg case, conduct a thorough investigation of all matters "relating to the taxicab business in the City of Chicago, to alleged monopolies relating thereto, to alleged actions in restraint of trade, and to alleged difficulties concerning the wages and remuneration of drivers" of the Checker Taxicab

Company; that this would necessitate long and protracted hearings and involve great expense to the petitioners; that he intended to issue and have served subpoenas *duces tecum* on the officials of the Yellow and Checker Taxicab Companies, requiring the production in the alleged contempt proceeding of their books and records; that such books and records do not bear on the issues involved; that Judge Green "is instigated by and conspiring with certain outside parties, who from ulterior motives are seeking to stir up trouble" between taxi drivers and the companies and the manufacturing companies; that he had indiscriminately issued warrants for the arrest of officials of the Checker and Yellow Cab Companies without any legal basis, on pretended criminal charges, for the purpose of creating public opinion against taxicab companies and the companies' officials, and thereby causing the defendants and the taxicab companies great trouble, expense and humiliation; that Judge Green, sitting as a judge in the municipal court, stated he would continue to issue warrants against the officials until they made a contract with the taxi drivers satisfactory to him; that he stated publicly he would strike any answer petitioners might file to the information filed by Roach, and that he has indicated in divers ways his intention of finding the petitioners guilty of contempt under the information regardless of the evidence that might be adduced, and that petitioners believe he will carry out such intentions; that by reason of the aforesaid, Judge Green was prejudiced and wholly disqualified to hear the matter before him, and that the municipal court had no jurisdiction of the matter, and the prayer was that a rule be entered requiring Judge Green to answer the petition showing cause why a writ of prohibition should not issue prohibiting him from proceeding with the alleged contempt proceeding.

No brief has been filed on behalf of Judge Green or the municipal court.

The petitioners contend that the court had no jurisdiction to hear Swedberg's motion and petition in support of it under sec. 89 of the Practice Act, because Swedberg had begun to serve the sentence imposed on him by Judge Green, by being incarcerated in the House of Correction. Without discussing the distinction between the Swedberg case pending before Judge Green and the recent case of *People v. Green,* 355 Ill. 468, where it was held that under certain circumstances the municipal court had jurisdiction under sec. 89 of the Practice Act to hear a motion under that section after the defendant had been found guilty and had commenced to serve his sentence in the House of Correction, in Chicago, we hold that under the authority just cited Judge Green had jurisdiction, even though it might be later held, on a writ of error or appeal under the present Practice Act to this court, that his judgment was erroneous.

We agree with counsel for the petitioners in the instant case that whether Swedberg owned the car, was wholly immaterial because sec. 41a, ch. 95a, under which Swedberg was prosecuted, imposed a penalty not on the owner of the automobile, but on the "person operating or driving" it.

The controlling question in the instant case is whether the superior court of Cook county had authority to issue a writ of prohibition as prayed for. Counsel for the petitioners, in their brief, say that the trial judge dismissed their petition on the theory that the superior court of Cook county had no jurisdiction to issue a writ of prohibition against the municipal court of Chicago because the municipal court of Chicago was not an inferior court, and that any error committed by Judge Green might be reversed on review by this court or by the Supreme Court. The question is one of first impression in this court. We are not, however, without authority in this State as

to the nature of the ancient common law writ of prohibition and when it might properly issue. *People ex rel. Earle v. Circuit Court of Cook County,* 169 Ill. 201; *People ex rel. Modern Woodmen of America v. Circuit Court of Washington County,* 347 Ill. 34.

In the *Circuit Court of Cook County* case it was said that a writ of prohibition was an extraordinary common law writ issued by a superior court to an inferior court to prevent the latter from exceeding its jurisdiction either by prohibiting it from assuming jurisdiction in a matter over which it had no control, or from going beyond its limited powers in a matter over which it had jurisdiction; that the writ operated upon an inferior court and not upon the parties to the suit and would only be issued in cases of extreme necessity where there was no other adequate remedy; that the object of the writ is (p. 205) : "not to remove the matter prohibited from the lower to the higher court for the purpose of procuring the decision of the latter court upon such matter, but to restrain the lower court from further prosecution of the original proceeding, when it has no jurisdiction over the subject matter in dispute." It was also held in that case that neither the Supreme nor the Appellate Courts of this State had original jurisdiction to issue the writ, that the writ could only be issued by these courts in aid of their appellate jurisdiction. In that case an original petition was filed in the Supreme Court against Judge Horton, a judge of the circuit court of Cook county, and the circuit court of Cook county to show cause why a writ of prohibition should not issue against the respondents, and it was there said (p. 205) that "The constitution is a limitation upon the powers of the legislature, but it is regarded as a grant of power to the executive and judicial departments of the government. Hence, the executive and judiciary can only

exercise such powers as are granted by the constitution," and that since section 2 of article 6 of our Constitution of 1870 provides that the Supreme Court "shall have original jurisdiction in cases relating to the revenue, in *mandamus* and *habeas corpus,* and appellate jurisdiction in all other cases," the Supreme Court had no power to issue the writ. The court there further said (p. 205): "A prohibition is an original remedial writ, as old as the common law itself."

In the *Circuit Court of Washington County* case, *supra* (347 Ill. 34), the court said (p. 39): "The writ of prohibition is of ancient origin. In Beame's Translation of Glanville, pages 56, 96, 97 and 98, a number of forms of such writs as then in use are set out. Glanville's treatise was written about 1181 and is the earliest known work on the English law. Originally, in England, jurisdiction to issue writs of prohibition was exercised by the Court of King's Bench, though it was later exercised by courts of chancery and common pleas or exchequer. (3 Blackstone's Com. 111.) . . . It has always been defined as an extraordinary judicial writ issued out of the court of superior jurisdiction and directed to an inferior court for the purpose of preventing the inferior court from usurping a jurisdiction with which it is not legally vested and to keep such court within the limits and bounds prescribed for it by law. . . .

"A writ of prohibition is a common law remedy, and, like other common law remedies, it is generally recognized as existing in this country unless abolished by positive statutory enactment. The writ is here exercised by an appellate or superior court to restrain an inferior court from acting without authority of law when damage and injustice are likely to follow from such action. It is a prerogative writ, and, like all other writs of that character, it is to be used with

caution, and only to secure order and regularity in judicial proceedings when none of the ordinary remedies provided by law are applicable or adequate''; that it was issued only to prohibit an inferior tribunal from assuming jurisdiction in a matter over which it had no control and also in going beyond its legitimate powers in a matter over which it had jurisdiction; that its object was not to remove the subject matter from the lower court to the higher court for the purpose of obtaining a decision on the merits of the case, but to restrain the lower court from further action; that it was never resorted to when there was another adequate remedy or to correct mere irregularity, and that the Supreme Court had no original jurisdiction to issue a writ of prohibition, but that it can issue such writ only in aid of appellate jurisdiction.

The circuit court of this State and the superior court of Cook county are provided for in the Constitution of 1870, and have original jurisdiction ''in all causes in law and equity.'' Sections 12, 23 and 24, article 6, Constitution of 1870. Section 12 provides: ''The circuit courts shall have original jurisdiction of all causes in law and equity.'' Section 23, which has to do with the courts of Cook county, provides: ''The superior court of Chicago shall be continued, and called the superior court of Cook county,'' and by section 24: ''Any judge of either of said courts shall have all the powers of a circuit judge.'' And it has been repeatedly held by our Supreme Court that the circuit courts and the superior court of Cook county exercise the same jurisdiction and that there is no distinction between them except in name. *Berkowitz v. Lester,* 121 Ill. 99. In that case the court said (p. 102): ''Section 23 [Article 6, Constitution of 1870] provides that the superior court of Chicago shall be continued, and called the superior court of Cook county; . . . judges of the superior court and judges of the circuit court

exercise the same powers, and, under the constitution, are placed upon the same footing. (*Jones v. Albee,* 70 Ill. 34; *Samuel v. Agnew,* 80 id. 553.) Indeed, under the constitution, there is no distinction, except in name, between the superior court of Cook county and the circuit court of Cook county. Both courts have the same jurisdiction and exercise the same powers.''

Since the writ of prohibition is a common law remedy, and since it is said in the *Circuit Court of Washington County* case, *supra,* that such writ is generally recognized as existing in this Country unless abolished by positive statutory enactment, and since we know of no statutory enactment abolishing such writ in this State, we hold that the circuit courts of this State and the superior court of Cook county have original jurisdiction under the constitution of this State to issue writs of prohibition in proper cases.

In the instant case we think it is obvious that from the averments of the information filed by Joseph Roach, as a friend of the court, which we have analyzed and quoted from, Judge Green had no jurisdiction to inquire into the matters set forth in that petition. Whether Swedberg owned the automobile at the time he injured the persons (as alleged in the information filed against him wherein he was charged with leaving the scene of the accident without leaving his name with the police officer, as the statute provides) was wholly immaterial. As stated, the statute makes the driver and not the owner of the automobile, who leaves the scene of the accident without leaving his name, subject to the penalties provided for in the statute. We think it is equally obvious that Judge Green, sitting as a judge of the municipal court, had no jurisdiction to determine whether the Checker Cab Company, the Yellow Cab Company, or the officials of these companies, were violating the Clayton or Sherman Acts, or whether they were engaged in a conspiracy in re-

straint of trade, nor any of the other allegations contained in the information. These questions were wholly foreign to the question whether the petitioners and the other persons named in the information filed by Roach, conspired to obstruct the administration of justice by inducing Swedberg to swear that he owned the taxicab in question when, as a matter of fact, it was alleged that it belonged to the Checker Cab Company.

Holding, as we do, that Judge Green while sitting in a branch of the municipal court was wholly without jurisdiction to inquire into any of the matters set forth in the information filed by Roach, the question then arises as to whether the municipal court of Chicago is inferior to the superior court of Cook county, in the sense that the latter court might issue its writ of prohibition. It has been held that the word "inferior" as used in this connection, does not relate to the intrinsic quality of the court, but merely to its relative rank as compared with the other courts. *Swift v. Wayne Circuit Judges,* 64 Mich. 479; *Croasdale v. Court of Quarter Sessions,* 88 N. J. L. 506; *Kirkwood v. Washington County,* 32 Ore. 568. An inferior court (using the term in the sense above indicated) is one that is limited in its jurisdiction as to subject matter and as to territory. The jurisdiction of the municipal court of Chicago does not extend beyond the limits of the city, while the superior court of Cook county has jurisdiction throughout the entire county. The municipal court has no jurisdiction in felony cases nor in certain tort cases where the damages exceed $1,000; it has no chancery jurisdiction nor can it issue other extraordinary writs such as mandamus. (*Lott v. Davis,* 264 Ill. 272.) Such matters are within the jurisdiction of the superior court of Cook county.

In *Reid v. Morton,* 119 Ill. 118, it was held that the city court of Alton was inferior in dignity and juris-

diction to the circuit court, although in most matters it had concurrent jurisdiction with that court within the City of Alton. The court there said (p. 127): "It is further urged, . . . that it is only inferior local courts which, under the constitution of 1848, might be established in cities, and that this Alton City Court is not an inferior court, inasmuch as it has concurrent jurisdiction, within the City of Alton, with the circuit court of Madison county, in all civil cases. It has not equal jurisdiction with the circuit court of Madison county in criminal cases, and its jurisdiction, in territorial extent, is less than that of the circuit court. Making it a court of record does not, in our opinion, make it, as contended, a superior and not an inferior court, within the meaning of the constitution. . . . The Alton City Court was, in dignity and in jurisdiction, an inferior court to the Supreme Court, and to the circuit court, and we cannot say that it was not an inferior local court, within the intendment of the constitution.''

To the same effect is the holding in the case of *Wolf v. Hope,* 210 Ill. 50, and in *Miller v. People,* 230 Ill. 65, where it was said (p. 74) that the municipal courts of Chicago "are limited, territorially, to the municipality in and for which they are created, and their jurisdiction is usually limited in amount to petty offenses. (Black's Law Dict.; 21 Am. & Eng. Ency. of Law, 2nd ed., 1.) Under the rule that the words 'municipal courts' were used in the amendment in their ordinary and natural meaning, the municipal court of Chicago is to be regarded as a local court of the city, established for the purpose of administering the law within the city, and not as a part of the judicial department of the government of the State at large. . . .''

(p. 75): "There is no substantial or material difference between the terms 'city court' and 'municipal

court,' both of which are courts of the municipality in which they are established, and the constitution of 1848, as well as the present constitution, provided for the establishment of such courts." See also *Lott v. Davis,* 264 Ill. 272.

In view of the foregoing authority we are of opinion that the municipal court of Chicago is inferior (as that word is understood as above stated) to the superior court of Cook county, and that if the allegations of the petition in the instant case are true, as we must assume on the record before us, then the superior court should have issued its writ to prohibit Judge Green from proceeding further with the contempt proceeding under the petition filed by *amicus curiae.* And it was no reason to refuse the writ because the party aggrieved might, on appeal or writ of error, have reversed any judgment that might be entered in the contempt proceeding by Judge Green. *Monette Road Imp. Dist. v. Dudley,* 144 Ark. 169; *Evans v. District Court,* 47 Idaho 267, 275 Pac. 99, 100.

In the *Dudley* case the Supreme Court of Arkansas said that the court in a proper case would issue a writ of prohibition although there might be a remedy by appeal. The court further said (p. 176): "If the absence of the right of appeal was essential to the issuance of a writ of prohibition, then that remedy would be entirely unavailable in any case, for under our Constitution the right of appeal is granted in all judicial proceedings. The true test is . . . whether or not the court is proceeding beyond its jurisdiction, and when that state of facts is shown to exist, the remedy by prohibition is the appropriate one. A litigant is not bound to submit to the exercise of jurisdiction not authorized by law, even though he has the right of appeal after the exercise of the jurisdiction has been consummated and has resulted in a judgment from which he can appeal."

And in the *Evans* case, *supra,* the court said (p. 2):

"A writ of prohibition will issue to arrest the proceedings of an inferior tribunal when it is acting in excess of its jurisdiction and there is no other plain, speedy, and adequate remedy in the ordinary course of the law. . . .

"The citation for contempt or rule to show cause is not such a final order that an appeal will lie therefrom. . . . We do not believe that plaintiffs should be compelled to submit to a judgment for contempt and then avail themselves of any right to a writ of review which may exist in such a situation."

In the instant case the petitioners and the other defendants mentioned in the contempt proceeding have no adequate remedy by appeal or writ of error after the contempt proceeding is disposed of by Judge Green. The proceeding would undoubtedly be long, expensive and useless, and if they should be discharged by Judge Green after such hearing, they would be wholly without remedy.

We think that in these circumstances the superior court of Cook county should have issued its writ of prohibition.

The judgment of the superior court of Cook county is reversed and the cause remanded with directions to order the defendants to answer the petition.

*Reversed and remanded with directions.*

McSURELY and MATCHETT, JJ., concur.